**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PARRIS W.,

                    Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

Civil Action No.: 20-13454 (CCC)

**OPINION**

**CECCHI, District Judge.**

## I.    INTRODUCTION

Before the Court is the appeal of Parris W.[1] ("Plaintiff") seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act ("SSA").  ECF No. 1; *see also* ECF Nos. 18, 23.  The Commissioner opposed the appeal.  *See* ECF No. 22.  This matter is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, the decision of the Administrative Law Judge ("ALJ") is affirmed.

## II.    BACKGROUND

Plaintiff is a 36-year-old female with a high school education.  Tr. at 22, 53.  At the time of her administrative hearing, Plaintiff was single and living with her mother, sister and brother.

---

[1] Pursuant to District of New Jersey standing order 2021-10, "any non-governmental party will be identified and referenced solely by first name and last initial" due to privacy concerns present in social security cases.  D.N.J. Standing Order 2021-10; *see also Bryan S. v. Kijakazi*, No. 20-cv-11145, 2022 WL 2916072, at *1 n.1 (D.N.J. July 25, 2022).  The Court further notes that the spelling of Plaintiff's first name appears throughout the record as both "Parris" and "Pariss."  The Court will use the spelling contained in the complaint.  ECF No. 1.

*Id.* at 56. Her last period of employment was in 2011, where she worked as a seasonal, part-time retail employee. *Id.* at 35. At all relevant times prior to 2011, Plaintiff has only ever maintained part-time employment opportunities. *Id.* at 54-55. Records indicate that Plaintiff suffers from seizure disorder and osteopenia. *Id.* at 17-18.

### A.    Plaintiff's Testimony and Medical Reports

Plaintiff testified at her administrative hearing that her seizure disorder started when she was roughly two years old but that she did not experience pervasive seizures throughout her time in school. *Id.* at 58. Plaintiff further testified that, around age of 17, her seizures resumed following a grand mal seizure. *Id.* at 59. In a March 2014 medical questionnaire, Plaintiff reported experiencing seizures lasting five to ten minutes but that she had not experienced such a seizure in roughly three months. *Id.* at 350. Following her last grand mal seizure in 2015, Plaintiff testified that she continues to get "shakes in [her] hands" and can "feel [her] heart beating fast." *Id.* at 60-61. She stated that these episodes occur haphazardly, and that she can experience two or three episodes in one day. *Id.* at 62. She clarified that these episodes are not the kind of severe seizures that include falling to the ground or biting her tongue. *Id.* at 60. However, in conflict with that testimony, Plaintiff completed a March 2015 medical questionnaire in which she reported experiencing loss of consciousness, convulsions and tongue-biting. *Id.* at 363. Nevertheless, Plaintiff reported that she is able to resume normal activities roughly ten minutes after experiencing an episode. *Id.*

In addition, as a result of taking her medication, Plaintiff stated that she experiences neck and back pain, and frequently naps for two to three hours a day. *Id.* at 66. She stated that this prevents her from doing any heavy lifting or carrying. *Id.* at 68. However, Plaintiff testified that she has never received a diagnosis or treatment for her neck or back pain. *Id.* at 80. A May 2014 bone density study indicated that Plaintiff suffers from moderate osteopenia. *Id.* at 507.

Despite her limitations, Plaintiff testified that she is able to do a number of activities, including bending over to put her shoes on, using the microwave, and making certain food items such as soups and sandwiches.  *Id.* at 67-68.  Plaintiff also stated that, while she does not drive, she does have her driver's license, and can travel alone on foot or by using public transportation. *Id.* at 21, 58.  Notwithstanding Plaintiff's testimony at her administrative hearing, medical records from University Hospital indicate that Plaintiff reported being aware of neither the timing nor frequency of her seizure episodes.  *Id.* at 20-21, 516-17.  Plaintiff was recorded as being "[n]ot [a] reliable historian" of her seizure activity.  *Id.* at 514.  Emergency room records from one of Plaintiff's more severe seizures indicates that Plaintiff experienced no tongue biting or incontinence, she was fully oriented and she expressed no physical complaints.  *Id.* at 20.  Medical records from Plaintiff's routine doctor's visits state that the frequency of her seizure episodes was unknown.  *Id.* at 514, 518.  Those same records state that Plaintiff had experienced no new seizures between doctor's visits, which were spaced several months apart.  *Id.* at 512, 516.  Plaintiff's family members also reported "notic[ing] fewer of these seizures."  *Id.* at 513.  Ultimately, doctors advised Plaintiff that brain surgery would be required to stop the seizures from occurring, but she was uninterested in any such procedure.  *Id.* at 65.

### B.    Medical Expert & Disability Determination Services Findings

Prior to the May 16, 2019, administrative hearing, medical expert Dr. Debra Pollack reviewed the entirety of Plaintiff's record.  *Id.* at 38.  Dr. Pollack testified that, in her opinion, Plaintiff did not meet the listing (11.02) for epilepsy because there was a lack of documentation regarding the frequency of Plaintiff's seizures.  *Id.* at 38-39.  She found that, while there was no question that Plaintiff suffered from epilepsy, the listing is very specific about the frequency of seizures occurring, which was not supported by the record.  *Id.* at 39.  In particular, Dr. Pollack

testified that the record did not reflect Plaintiff experiencing seizures once a month over a period of three consecutive months, as noted in the listing.  *Id.* at 40.  She further opined that the occurrence of six seizure episodes during a single EEG study was not indicative of the appropriate frequency because (1) a short-term frequency (*e.g.,* across 20 minutes or three days) does not necessarily reflect long-term frequency (*e.g.*, across months), and (2) Plaintiff's medication was purposefully reduced during those studies.  *Id.* at 42-43.  Plaintiff's counsel sought a 30-day extension to obtain records from Dr. Marks, Plaintiff's treating physician, regarding the frequency of Plaintiff's seizures, *id.* at 44, but those records were never provided to the ALJ, *id.* at 21.

Disability Determination Services ("DDS") consultants also provided determinations about Plaintiff's disability status.  *Id.* at 99-101, 109-11.  In June 2014, Dr. Alka Bishnoi opined that Plaintiff's impairments included epilepsy and major motor seizures.  *Id.* at 99.  Dr. Bishnoi reported that Plaintiff's statements were only partially credible and not substantiated by the objective evidence as they pertained to the intensity, persistence and functionally limiting effects of her impairments.  *Id.*  Dr. Bishnoi further reported that Plaintiff had no exertional limitations except that she could never climb ladders, ropes or scaffolds.  *Id.* at 100.  The report also stated that, based on objective evidence, Plaintiff's seizures were infrequent.  *Id.* at 99.

In July 2015, Dr. Gary S. Friedman also opined that Plaintiff's impairments included epilepsy and major motor seizures.  *Id.* at 108-09.  Consistent with Dr. Bishnoi, Dr. Friedman also reported that Plaintiff's statements were partially credible and not substantiated by the objective evidence, which suggested that Plaintiff's seizures were infrequent.  *Id.* at 109.  Dr. Friedman also reported that Plaintiff had no exertional limitations except that she should never climb ladders, ropes or scaffolds, and should never be on unprotected heights or operate dangerous machinery.  *Id.* at 110-11.

### C.   Procedural History

In February 2014, Plaintiff filed an application for SSI, alleging disability beginning on January 17, 2014. Tr. at 286-94; ECF No. 18 at 1. Plaintiff's claim was denied initially and upon reconsideration. Tr. at 95-113. Plaintiff, who was represented by counsel, Plaintiff's mother and an impartial vocational expert testified at a hearing on May 22, 2017. *Id.* at 48-94. On July 18, 2017, the ALJ issued a decision finding Plaintiff was not disabled. *Id.* at 114-28. On July 11, 2018, the Social Security Administration's Appeals Council issued an order remanding Plaintiff's case back to the ALJ. *Id.* at 129-33. A subsequent hearing was held on May 16, 2019, whereby Plaintiff, an impartial vocational expert and an impartial medical expert testified. *Id.* at 29-47. On July 1, 2019, the ALJ issued a second decision finding Plaintiff was not disabled. *Id.* at 11-23. Plaintiff again sought review from the Appeals Council, which was denied. ECF No. 18 at 1-2. This appeal followed.

## III.   LEGAL STANDARD

### A.   Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. §§ 405(g), 1383(c)(3). The Court is not "permitted to re-weigh the evidence or impose [its] own factual determinations," but must give deference to the administrative findings. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011); *see also* 42 U.S.C. § 405(g). Nevertheless, the Court must "scrutinize the record as a whole to determine whether the conclusions reached are rational" and substantiated by substantial evidence. *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (citations omitted). Substantial evidence is more than a mere scintilla and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chandler*, 667 F.3d at 359 (citations omitted). If the factual record is adequately developed,

substantial evidence "may be 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  In other words, under this deferential standard of review, the Court may not set aside the ALJ's decision merely because it would have come to a different conclusion. *See Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 479 (3d Cir. 2007).

### B.    Determining Disability

In order to be eligible for benefits under the SSA, a claimant must show she is disabled by demonstrating an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Considering the claimant's age, education, and work experience, disability is evaluated by the claimant's ability to engage in her previous work or any other form of substantial gainful activity existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).  A claimant is disabled for SSA purposes only if her physical or mental impairments are "of such severity that [s]he is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Decisions regarding disability are made individually and will be "based on evidence adduced at a hearing." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000) (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)).  Congress has established the type of evidence necessary to prove the existence of a disabling impairment by defining a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3); 1382a(3)(D).

### C.    Sequential Evaluation Process For A Continuing Disability

The Social Security Administration follows a five-step, sequential evaluation to determine whether a claimant is disabled under the SSA.  20 C.F.R. §§ 404.1520, 416.920.

First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  *Sykes*, 228 F.3d at 262.  Second, if the claimant is not engaged in such activity, the ALJ determines whether the claimant has any impairments severe enough to limit her ability to work.  *Id.*  Third, if she has any severe impairments, the ALJ considers the medical evidence to determine whether the impairment or combination of impairments is included in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  If the claimant's impairment(s) medically equal one of the Listings, this results in a presumption of disability.  *Sykes*, 228 F.3d at 262.  If the impairment is not in the Listings, the ALJ must determine how much residual functional capacity ("RFC") the applicant retains despite her impairment.  *Id.* at 263.  Fourth, the ALJ must consider whether the claimant's RFC is enough to perform her past relevant work.  *Id.*  Fifth, if her RFC is not sufficient to perform past work, the ALJ must determine whether there is other work in the national economy the claimant can perform.  *Id.*

The evaluation continues through each step unless it is ascertained at any point the claimant is or is not disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the ultimate burden of establishing steps one through four.  *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).  The burden shifts to the Commissioner at step five to prove that the claimant can perform a job that exists in the national economy.  *Id.* at 555.

## IV.    **DISCUSSION**

### A.    **Summary of the ALJ's Decision**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 17, 2014, the application date.  Tr. at 17.  At step two, the ALJ found that Plaintiff had the following severe impairment:  seizure disorder (20 CFR 416.920(c)).  *Id.*  At this step, the ALJ noted that this impairment was severe because it "significantly limit[s] the ability to perform basic work activities."  *Id.*  The ALJ also found that Plaintiff suffered from osteopenia, which was a non-severe impairment because it "has not required more than conservative treatment and the claimant failed to allege that any of this impairment caused her any distress" beyond occasional neck, back and hand pain.  *Id.* at 18.  At step three, the ALJ determined that Plaintiff's conditions did not meet or were not medically equal to the listed impairments in the Listings.  *Id.*  Because the ALJ found that Plaintiff's impairments did not equal an impairment enumerated in the Listings, the ALJ then formulated Plaintiff's RFC.  *Id.* at 18-22.  Based on all the evidence in the record, the ALJ found that Plaintiff could "perform light work as defined in 20 CFR 416.967(b) except she can never be exposed to unprotected heights or hazardous machinery; can frequently finger, handle, and balance; and can never climb ropes, ladders, or scaffolds.  She can never crawl but [can] occasionally stoop and crouch."  *Id.* at 18.

At step four, the ALJ found that Plaintiff had no past relevant work under 20 CFR 416.965. *Id.* at 22.  And at step five, the ALJ determined, after considering Plaintiff's age, education, experience and RFC, that jobs exist in significant numbers in the national economy that Plaintiff can perform.  *Id.*  The vocational expert testified that Plaintiff would be qualified to operate as an assembler, bagger, or mail sorter, for which there was a combined approximate total of 160,000 jobs in the national economy.  *Id.* at 22.  In reliance on that testimony, and with corroboration of the Dictionary of Occupational Titles and the Medical-Vocational Guidelines, the ALJ found that

Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 23.  As a result, the ALJ concluded that a finding of "not disabled" was appropriate.  *Id.*

### B.    Plaintiff's Arguments on Appeal

In the instant appeal, Plaintiff asserts four bases upon which the ALJ's ruling was in error. First, Plaintiff argues that the ALJ improperly evaluated the evidence when making his step two findings.  ECF No. 18 at 10-11.  Second, she contends that the ALJ's step three findings were legally deficient and unsupported by the available evidence.  *Id.* at 11-17, 19-23.  Third, she argues that the ALJ's step five finding was erroneous.  *Id.* at 23-24.  And Fourth, Plaintiff contends that the ALJ failed to comply with the remand order issued by the Appeals Council.  *Id.* at 17.

### 1.    The ALJ's Step Two Findings

At step two, the ALJ is tasked with determining whether the claimant has any impairments severe enough to limit her ability to work.  *Sykes*, 228 F.3d at 262.  Impairments are severe if they are "something beyond a slight abnormality which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities." *Rebecca L. v. Comm'r of Soc. Sec.*, 617 F. Supp. 3d 256, 266 (D.N.J. 2022) (quoting *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004)).  Ultimately, "[t]he burden is on the claimant to show that an impairment qualifies as severe." *Id.*

Here, the ALJ found that Plaintiff's seizure disorder constituted a severe impairment.  Tr. at 17.  In so finding, he concluded that Plaintiff's seizure disorder "significantly limit[s] [Plaintiff's] ability to perform basic work activities." *Id.* at 18.  The ALJ also found that Plaintiff suffers from osteopenia, but that this impairment was not severe because it did "not require[ ] more than conservative treatment" and Plaintiff "failed to allege that any of this impairment caused her any distress" beyond occasional neck, back and hand pain.  *Id.*  As an initial matter, objective

evidence in the record supports the ALJ's determination.  Primarily, a June 2014 report from University Hospital diagnosed Plaintiff with osteopenia and recommended no more than a decrease in her Dilantin intake, coupled with an increase in carbamazepine.  Tr. at 468; *see also id.* at 500 (identifying "[m]oderate osteopenia evidenced by the measurement of the right femoral neck").  In addition, the ALJ still considered Plaintiff's osteopenia diagnosis when formulating her RFC at step three.  *See* ECF No. 22 at 5; Tr. at 18, 20; *see also Rebecca L.*, 370 F.3d at 266 ("[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." (internal citation omitted)).

And finally, as Defendant notes, "even if [the ALJ] had erroneously concluded that some of [Plaintiff's] other impairments were not severe, any error [would be] harmless."  *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2006); *see also* ECF No. 22 at 5.  Here, the ALJ found that Plaintiff suffered from a severe impairment, her seizure disorder, under step 2.  *See Desando v. Astrue*, No. 07-CV-1823, 2009 WL 890940, at *6 (M.D. Pa. Mar. 31, 2009) ("Because the ALJ found that [plaintiff] did have severe impairments sufficient to move beyond the second step . . . his failure to address [a separate impairment] is irrelevant and harmless.").

Accordingly, the Court finds that the ALJ properly evaluated the evidence in concluding that Plaintiff's osteopenia was not severe.

### 2.     The ALJ's Step Three Findings

At step three, the ALJ must determine "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations."  *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (internal citation omitted).  The Listings "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'"  *Sullivan v. Zebley*, 493 U.S. 521, 532

(1990) (quoting 20 C.F.R. § 416.925(a)).  "An impairment that manifests only some of [the Listing] criteria, no matter how severely, does not qualify."  *Id.* at 530.

Here, Plaintiff contends that 11.02 (Epilepsy) is the relevant Listing corresponding to her impairments, specifically 11.02(B) and 11.02(D).  ECF No. 18 at 11.  11.02(B) requires a showing of "[d]yscognitive seizures [ ] occurring at least once a week for at least three consecutive months," and 11.02(D) requires a showing of "[d]yscognitive seizures [ ] occurring at least every 2 weeks for at least three consecutive months."  20 C.F.R. § Pt. 404, Subpt. P., App. 1.  The ALJ also assessed whether Plaintiff's impairments satisfied 11.02(A), generalized clonic-tonic seizures occurring once a month for three consecutive months, and 11.02(C), generalized clonic-tonic seizures occurring every two months for four consecutive months.  Tr. at 18.

The evidence provided in the record supports the ALJ's finding that Plaintiff's impairments do not meet or equal the requirements of 11.02.  Neither the ALJ nor this Court challenges the fact that Plaintiff has a history of suffering seizures.  To wit, the ALJ found that Plaintiff's seizures constituted a severe impairment.  Tr. at 17.  However, Plaintiff has failed to show, through sufficient objective or subjective evidence, that her seizures meet the frequency requirements of 11.02(A)-(D).

### i.    The Expert Testimony and Objective Record

When analyzing a medical opinion, the SSA regulations provide a framework for the ALJ to determine the persuasiveness of that opinion based on the following factors: (1) supportability (*i.e.*, whether the medical opinion is supported by objective medical evidence); (2) consistency (*i.e.*, whether the medical opinion is consistent with other medical and nonmedical sources in the record); (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) any other factors that "tend to support or contradict a medical opinion or

prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also David K.*, No. 20-CV-12419, 2022 WL 225451, at *6 (D.N.J. Jan. 26, 2022).   When evaluating the persuasiveness of a medical opinion, the most important factors are supportability and consistency.   20 C.F.R. §§ 404.1520c(a), 416.920c(a).   The ALJ must articulate his consideration of the medical opinion evidence, including how persuasive he finds the medical opinions in the case record.   *Id.* §§ 404.1520c(b), 416.920c(b).   Specifically, the ALJ must explain how he considered the "supportability" and "consistency" factors for a medical source's opinion.   *Id.*   The ALJ may—but is not required to—explain how he considered the remaining factors.   *Id.*

Dr. Pollack, the medical expert in this case, acknowledged Plaintiff's unquestionable history of seizures and that her EEGs and MRIs confirmed as much. Tr. at 39.   However, she concluded that Plaintiff failed to satisfy the Listing requirements because there was a lack of evidence documenting the frequency of her seizures within the relevant time period.   *Id.* at 38-39. For example, Dr. Pollack could not identify any documentary evidence supporting a finding that Plaintiff suffered seizures at least once a month over a period of three consecutive months.   *Id.* at 40.   During the hearing, Plaintiff's counsel directed Dr. Pollack to medical records showing that Plaintiff experienced six "events" during a 2014 EEG monitoring study.   *Id.* at 42; *see also id.* at 509.   In response, Dr. Pollack opined that such evidence was not sufficient because (1) short-term frequency does not automatically reflect the long-term frequency required in the Listing, and (2) Plaintiff's medication was purposefully reduced during that study, which could be a contributing factor to Plaintiff's events.   *Id.* at 42-43.   The ALJ gave "great weight" to Dr. Pollack's testimony given her experience and because her opinion was consistent with the objective evidence.   *Id.* at 18.   Notably, Plaintiff's counsel sought a 30-day extension in order to obtain medical records from Plaintiff's treating physician attesting to the frequency of Plaintiff's seizures.   *Id.* at 44.   The ALJ granted that request, but no supplemental documents were ever provided.   *Id.* at 18, 21.

The objective evidence does in fact align with Dr. Pollack's testimony and the ALJ's conclusion.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (finding ALJ's step three analysis sufficient where ALJ "considered the appropriate factors," "discusse[d] the evidence," and noted the lack of frequency in the claimant's treatments).  Plaintiff did undergo EEG monitoring in May 2014, whereby "she had at least 6 [ ] events . . . characterized by rhythmic buildup with high frequency discharge in the right frontotemporal and frontocentral region in the frequency of about 15 to 18 hertz."  Tr. at 509.  During the monitoring, Plaintiff "did not report to the technician any changes."  *Id.*  Several months later, in August 2014, Plaintiff had a follow-up appointment at University Hospital, in which it was recorded that she had experienced "[n]o seizures since [her] last visit."[2]  *Id.* at 516.  The record suggests that Plaintiff's seizure frequency was unknown.  *Id.* at 518.  Three months later, in October 2014, medical records again reflect that Plaintiff had experienced no seizures since her prior visit.  *Id.* at 512.  Plaintiff reported being "unaware of the frequency of her seizures" and family members reported "notic[ing] fewer of these seizures."  *Id.* at 513.  The report again listed Plaintiff's seizure frequency as unknown, and identified Plaintiff as "[n]ot [a] reliable historian."  *Id.* at 514.

Therefore, the ALJ properly considered the persuasiveness of Dr. Pollack's opinion in accordance with the applicable regulations.[3]  *See* C.F.R. § 404.1520(c)(1)–(2); *see also Costello v. Comm'r of Soc. Sec.*, 2022 WL 807382, at *5 (D.N.J. Mar. 17, 2022).

---

[2] As best as can be inferred from the record, Plaintiff's last visit was two months prior in June 2014.  Tr. at 519.  At that time, Plaintiff stated that she had no "recollection of her seizure frequency" and her sister reported "a couple of seizures she noticed."  *Id.* at 520.

[3] To the extent Plaintiff challenges the limited weight that the ALJ afforded to the DDS consultants' opinions, ECF No. 18 at 18, those opinions appear to be consistent with the ALJ's and Dr. Pollack's conclusions, *see* Tr. at 99, 109 (stating that "based on [the] evidence," the "frequency of [Plaintiff's] seizures [was] infrequent").

ii.    **The Subjective and Third-Party Evidence**

The ALJ, as the fact finder, has the sole responsibility to weigh a claimant's complaints about her symptoms against the record as a whole. *See Zirnsak v. Colvin,* 777 F.3d 607 (3d Cir. 2014) (citing *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009)); 20 C.F.R. § 404.1529(a). The ALJ is guided by a two-step framework when evaluating this evidence. *Costello*, 2022 WL 807382, at *5 (citing 20 C.F.R. § 404.1529). First, "the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms." *Id.* And second, "the ALJ must evaluate the 'intensity, persistence, and limiting effects' of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." *Id.* If the subjective statements conflict with the objective medical evidence, the ALJ may discredit them. *Id.*

Here, the ALJ found that Plaintiff suffered from both severe (seizure disorder) and non-severe (osteopenia) impairments that "could reasonably be expected to cause [her] alleged symptoms." Tr. at 19. However, the ALJ disagreed with the subjective evidence concerning the intensity, persistence and limiting effects of those symptoms. *Id.* Plaintiff asserts that the ALJ "failed to consider the side [ ] effects of [her] medication." ECF No. 18 at 19. She alleges that her medication regimen taken to treat her impairments—primarily her Dilantin intake—causes her to suffer from chronic napping two to three hours a day, pain in her neck, back and wrists, lack of concentration, and a poor memory. *See, e.g.*, *id.* at 10-11, 19, 22-23. She also argues that the ALJ "failed to give proper credence to [her] complaints [ ] concerning the frequency of her seizure activity." *Id.* at 15.

Plaintiff's arguments here do not establish a lack of substantial evidence as to the ALJ's credibility determination. At the hearing, Plaintiff was questioned about the side effects of her medication, eliciting testimony about her chronic napping, occasional pain and bone thinning. Tr.

at 66-69.  And as Defendant notes, the ALJ explicitly considered Plaintiff's testimony in his ruling, finding that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence."  Tr. at 19; *see also* ECF No. 22 at 11; *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (holding that the ALJ is required to adequately explain his reasons for rejecting and discounting the evidence).  For example, the ALJ observed that reports from several visits to University Hospital over a four-month period indicated that Plaintiff was neither aware of when nor how frequently her seizures were occurring.  Tr. at 20-21.  As noted above, the ALJ also found that Plaintiff's osteopenia had never required more than conservative treatment and only caused occasional pain.  *Id.* at 18.  In fact, the ALJ asked Plaintiff whether she ever received a diagnosis or treatment plan for her neck and back pain, which she had not.[4]  *Id.* at 80-81.  Because the Plaintiff's subjective complaints were inconsistent with these specific elements of the record, the ALJ justifiably discounted them. Accordingly, the ALJ properly "g[a]ve some indication of the evidence which he rejects and his reason(s) for discounting such evidence," and thus satisfied his obligation.  *Burnett,* 220. F.3d at 121; *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (explaining an ALJ is not required "to use particular language or adhere to a particular format," but only to "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").

Plaintiff also challenges the ALJ's failure to consider testimony provided by Plaintiff's mother.  ECF No. 18 at 14.  In his decision, the ALJ observed that the report and testimony of Plaintiff's mother deserved "limited weight" because her "personal connection with [Plaintiff]" made it "difficult to provide an objective view of [Plaintiff's] limitations."  Tr. at 21.  The ALJ

---

[4] Despite this, the ALJ still considered Plaintiff's neck, back, and wrist pain when limiting the "light work" that Plaintiff can do.  Tr. at 18 (finding that Plaintiff "can never climb ropes, ladders or scaffolds" and "can never crawl"); *see also* ECF No. 22 at 12.

further observed that Plaintiff's mother "has no professional training to assess [Plaintiff's] functional capacity," and her observations did not align with the objective medical evidence. *Id.* Based on these considerations, the ALJ's decision to discount the observations of Plaintiff's mother was appropriate. *See Gonzales v. Comm'r of Soc. Sec.*, No. 19-CV-21276, 2021 WL 5027986, at *5 (D.N.J. Oct. 28, 2021) (finding it was appropriate for ALJ to discount report submitted by Plaintiff's mother "because [she] was not an acceptable medical source"); *see also* Social Security Ruling 06-03p, 71 Fed. Reg. 45593-03, 45596 (Aug. 9, 2006) (stating ALJ may, when faced with evidence from a claimant's family members, "consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors").

### iii.    Formulation of Plaintiff's RFC

The responsibility for assessing and assigning a claimant's RFC rests solely with the ALJ, not with any particular medical source. 20 C.F.R. §§ 404.1527(d)(2)-(3); 404.1546(c); *see also Chandler,* 667 F.3d at 361. The ALJ reviews "all of the relevant medical and other evidence" in the record and resolves conflicts in the evidence in determining the plaintiff's RFC. 20 C.F.R. § 404.1545(a)(3). Further, the ALJ must "provide a 'clear and satisfactory explication' of the basis on which his determination rests." *Mays v. Barnhart*, 78 F. App'x 808, 812 (3d Cir. 2003) (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Here, Plaintiff asserts that the ALJ's RFC determination was legally deficient and not supported by the available evidence. ECF No. 18 at 20-23. Specifically, she argues that the ALJ's RFC assessment "is simply conclusory and does not contain any rationale or reference to the supporting evidence" as is required by the applicable regulations. *Id.* at 21. Plaintiff further contends that the available evidence proves that she cannot perform "light work" given her symptoms and inability to "stand and work for 6 hours out of an 8-hour workday." *Id.* at 22-23.

16

In determining Plaintiff's RFC, the ALJ conducted a thorough review of the relevant evidence in the record. *See* Tr. at 18-22. At the outset, the ALJ stated that he considered "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence," and he "also considered [the] opinion evidence." *Id.* at 18-19. Within that review, the ALJ cited to Plaintiff's testimony in which she stated that she had never been evaluated or significantly treated for her neck and back pain. *Id.* at 19. He also cited to emergency room records indicating that, even following her 2013 tonic clonic seizure, Plaintiff experienced no tongue biting or incontinence, she was fully oriented and she expressed no physical complaints. *Id.* at 20. The ALJ thoroughly walked through several years of medical records regarding Plaintiff's seizures to establish a full picture of the medical evidence as part of his RFC determination. *Id.* at 19-21. He further cited, and afforded partial weight, to reports from DDS consultants, who "opined that [Plaintiff] has no exertional limitations but could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards." *Id.* at 21. In sum, the ALJ found that this evidence supported limiting Plaintiff "to a light exertional level [of work] with additional limitations." *Id.*; *see also Morel v. Colvin*, No. 14-CV-2934, 2016 WL 1270758, at *6 (D.N.J. Apr. 1, 2016) ("The claimant need not be pain-free to be found 'not disabled' especially when her work issue requires a lower exertional level.").

Accordingly, as required, the ALJ has "provide[d] a 'clear and satisfactory explication' of the basis on which his determination rests" with respect to Plaintiff's impairments. *Mays*, 78 F. App'x at 812.

### 3.   The ALJ's Step Five Findings

Plaintiff attacks the ALJ's step five findings on two grounds. First, mirroring her RFC challenge discussed above, Plaintiff argues that the ALJ failed to provide the vocational expert with an accurate hypothetical because he omitted limitations on Plaintiff's "walking, standing and

side effects of medication" that she asserts are supported by the record.  ECF No. 18 at 23.  Second, Plaintiff argues that the ALJ erroneously found that there were a significant number of available, eligible jobs in the market because he relied on jobs available in the national economy, not in New Jersey.  *Id.* at 24.

The ALJ asked the vocational expert to identify applicable jobs for an individual "at the light exertional level . . . with additional limitation[s] of never climb[ing] ropes, ladders, or scaffolds; never crawl[ing]; [and] occasionally stoop[ing] and crouch[ing]."  *Id.* at 91.  The ALJ also asked the vocational expert to further consider the additional limitations that the individual could "never be exposed to unprotected heights or hazardous machinery; [but could] frequently finger, handle, and balance."  *Id.* at 90.  The limitations identified by the ALJ are identical to the limitations deemed credible and stated in the RFC, which, as discussed above, the Court finds was not erroneous.  *Compare* Tr. 90-91, *with id.* at 18; *see also Stancavage v. Saul*, 469 F. Supp. 3d 311, 340 (M.D. Pa. 2020) (noting that the ALJ "is not required to submit to the vocational expert every impairment alleged by a claimant," just "all of a claimant's credibly established limitations").  Plaintiff's RFC was also crafted after the ALJ considered the history of Plaintiff's medicine regimen and the credible limits on Plaintiff's physical capabilities.  *Id.* at 23-24.  In response, the vocational expert identified mail sorter, bagger, and assembler as three jobs for which an individual such as that posed in the hypothetical would be eligible.  *Id.* at 91.   Accordingly, the Court finds that the ALJ did not fail to provide the vocational expert with an appropriate hypothetical in connection with establishing Plaintiff's job eligibility.

Additionally, based on the three light exertional job roles identified by the vocational expert, the ALJ found that there are approximately 160,000 eligible jobs nationally.  Tr. at 22 (finding 120,000 assembler jobs, 10,000 bagger jobs and 30,000 mail sorter jobs).  While Plaintiff seemingly does not challenge these numbers, she argues that only 3,200 eligible jobs are available

in the State of New Jersey.  ECF No. 18 at 24 (identifying 2,400 assembler jobs, 200 bagger jobs and 600 mail sorter jobs in New Jersey).  However, as the Third Circuit Court of Appeals has noted, "there is no precise estimate for what constitutes 'significant numbers' of jobs under the Social Security Act."  *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013).  The ALJ may look to evidence of jobs in the national economy available in significant numbers, even if such jobs are not as prevalent in the local economy.  *Id.* (finding vocational expert testimony of 20,000 jobs in the national economy was sufficient for a finding of disability, even where only 100 such jobs were identified locally); *see also Stacey S. v. Comm'r of Soc. Sec.*, No. 21-CV-20433, 2022 WL 16834673, at *8 (D.N.J. Nov. 8, 2022) (finding evidence of "hundreds of thousands of jobs available in the national economy" was "more than enough for the ALJ to satisfy the step 5 burden").  As such, the Court finds that the ALJ did not err in finding that eligible jobs exist in significant numbers for purposes of making a disability assessment.  *See Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d Cir. 2013) (finding ALJ did not err in concluding that 569 jobs in the national economy was evidence of work in significant numbers).

### 4.     The ALJ's Compliance with the Appeals Council's Remand Order

Finally, Plaintiff argues that the ALJ failed to comply with the directives of the Appeals Council in their July 11, 2018, remand order.  ECF No. 18 at 16-17, 19.  Among other things, the ALJ was directed to "[o]btain additional evidence concerning [Plaintiff's] impairments in order to complete the administrative record," noting that such evidence "may include, if warranted and available, a mental health consultative examination and medical source opinions."  Tr. at 132.  The ALJ was also directed to "[g]ive further consideration to the third-party opinion evidence from [Plaintiff's] mother . . . and explain the weight given to such opinion evidence," and "[g]ive further consideration to whether [Plaintiff's] impairment(s) meet or equal the severity of Listing 11.02." *Id.*  Plaintiff challenges that the ALJ has failed to follow these directives.

The Appeals Council's remand order is explicit that any mental health consultative exam or medical source opinion as to Plaintiff's mental impairment was discretionary and offered "if warranted." *Id.* at 132. The ALJ otherwise did hear the testimony of Dr. Pollack, who opined as to whether Plaintiff's impairments met or equaled the severity of Listing 11.02, in part based on evidence concerning the frequency of Plaintiff's seizures. *Id.* at 21. To the extent Plaintiff now asserts that the record was incomplete, the ALJ "is not required to act as claimant's counsel." *Conley v. Calvin*, No. 15-CV-722, 2016 WL 3436435, at *10 (D. Del. June 20, 2016) (internal citation omitted). In fact, Plaintiff was given 30 days to furnish additional medical records attesting to the frequency of her seizures. Tr. at 21. The ALJ stated at Plaintiff's hearing that, upon receipt of those medical records, "that should complete the record." *Id.* at 46. At that time, Plaintiff's counsel did not challenge that the record remained incomplete. *See Maes v. Astrue,* 522 F.3d 1093, 1097 (10th Cir. 2008) ("Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation."). And ultimately, Plaintiff never provided the supplemental records. *Id.* at 21.

Further, it is indisputable that the ALJ considered the opinions of Plaintiff's mother and explained the weight he gave to those opinions in accordance with the Appeals Council's remand order. In his decision, the ALJ recounted the report and testimony provided by Plaintiff's mother, finding this third-party evidence should be afforded "limited weight." *Id.* at 21. He explained that this conclusion was drawn from the fact that Plaintiff's mother has a personal connection to Plaintiff, has no professional training or expertise, and provided observations that were unsupported by the objective evidence. *Id.* Nonetheless, the ALJ still took "this third party statement [ ] under consideration as it is based on personal observation of [Plaintiff]." *Id.* Accordingly, the ALJ did not fail to abide by the Appeals Council's July 11, 2018, remand order.

## V.    <u>**CONCLUSION**</u>

For the reasons above, the ALJ's decision is affirmed.  An appropriate Order will follow.

**DATE:** July 24, 2023

s/ Claire C. Cecchi
_____
**CLAIRE C. CECCHI, U.S.D.J.**